

# OFFICE OF THE ATTORNEY GENERAL OF TEXAS
## AUSTIN

GERALD C. MANN
ATTORNEY GENERAL

Honorable James E. Kilday
Director
Motor Transportation Division
Railroad Commission of Texas
Austin, Texas

Dear Sir:

> Opinion No. O-1592
> Re: Construction of Section 1
> (g) of House Bill No. 335,
> Acts of Forty-second Legis-
> lature, Article 911b,
> Vernon's Annotated Civil
> Statutes, known as the
> Motor Carrier Act.

We are in receipt of your letter of October 16, 1939, in which you request the opinion of this department upon the following questions:

> 1. Does the Railroad Commission of Texas have authority to issue a certificate of Public Convenience and Necessity covering routes from one incorporated city passing through a second incorporated city to an unincorporated town which is the terminus of operation?

> "2. Does the Railroad Commission of Texas have authority to issue a certificate of Public Convenience and Necessity from an incorporated town to an unincorporated town where there are no towns between the two?

> "3. Would there be a distinction between these two operations effecting motor transportation?"

Article 911b, Vernon's Texas Civil Statutes (House Bill No. 335, Acts of 1931), provides in Section 2 that:

> "No motor carrier, as defined in the preceding section, shall operate any motor-propel-

Honorable James E. Kilday, Page 2

led vehicle for the purpose of transportation
or carriage of property for compensation or
hire over any public highway in the State ex-
cept in accordance with the provisions of this
Act . . . "

Sections 3, 5 and 6 of the Act require such
"motor carriers" to secure certificates of public conven-
ience and necessity or permits from the Railroad Commis-
sion of Texas.

Section 1 (g) of the above Act defines a "motor
carrier" in the following language:

"(g) The term 'motor carrier' means any
person, firm, corporation, company, co-part-
nership, association or joint stock associa-
tion, and their lessees, receivers or trus-
tees appointed by any court whatsoever, own-
ing, controlling, managing, operating or
causing to be operated any motor propelled
vehicle used in transporting property for
compensation or hire over any public high-
way in this State, where in the course of
such transportation a highway between two or
more incorporated cities, towns or villages
is traversed; provided, that the term 'motor
carrier' as used in this Act shall not in-
clude, and this Act shall not apply to motor
vehicles operated exclusively within the in-
corporated limits of cities or towns."

The proper determination of your questions depends
upon the meaning of the term "motor carrier" as defined in
House Bill No. 335, and, more specifically, the intention
of the Legislature in inserting the clause, "where in the
course of such transportation a highway between two or more
incorporated cities, towns, or villages is traversed."

The primary purpose in construing a statute is
to ascertain the intention of the Legislature. Ordinarily
words in common use contained in a statute will be given
their natural and popular meaning unless a contrary inten-
tion is clearly apparent from the context or unless there
is some necessity in a particular case for adopting a dif-
ferent construction. The inquiry is not to its abstract
meaning, but as to the sense in which it is used; hence,
in every case the particular meaning depends upon, and
must be determined by, the context and subject matter, and

Honorable James E. Kilday, Page 3

the evident intention of the Legislature. The history of
legislation generally, pertaining to the subject matter,
may be considered and resort may be had to legislative
journals and records to ascertain the history of the Act
as an aid to construction. 39 Tex. Jur., p. 197, Section
105; p. 195, Section 104; p. 231, Section 123; p. 230,
Section 122, and cases therein cited.

Acts of 1929, Forty-first Legislature, Regular
Session, page 698, House Bill No. 654, Chapter 314, de-
fined the term "motor carrier" as follows:

"Section 1. (a) The term 'motor carrier'
when used in this Act denotes any person,
firm, corporation, co-partnership, associa-
tion, joint stock association, receiver, trus-
tee, or lessee who operates or causes to be
operated any motor propelled vehicle (not usu-
ally operated on or over rails) over or along
the highways or streets of this State for the
purpose of carrying or transporting property
for compensation or hire between two or more
incorporated cities, towns or villages."

Soon after the passage of the 1929 Act this de-
partment rendered an opinion in response to a question pro-
pounded by the Railroad Commission of Texas (Conference
Opinion No. 2776, Book 63, page 160, dated June 26, 1929,
Report and Opinions of the Attorney General, 1928-1930,
page 218), in which it was ruled:

"Section 1. (a) of the Act defines a
'motor carrier' as being a motor propelled
vehicle operated along the highways or
streets for the purpose of carrying or trans-
porting property for compensation or hire
'between two or more incorporated cities,
towns, or villages'. We believe that this
Act is clear in requiring that before a motor
vehicle constitutes a motor carrier, the op-
eration must be between two or more cities,
towns, or villages, which are incorporated,
and that the operation between two points,
only one of which is incorporated, does not
come within the terms of the Act so as to re-
quire supervision and regulation by the Rail-
road Commission.

" . . . We see that before any motor ve-
hicle becomes a motor carrier, it (1) must

Honorable James E. Kilday, Page 4

carry or transport property for hire or com-
pensation, and (2) must operate between two
municipal corporations; otherwise, it is not
a motor carrier under this Act if it lacks
either of these two characteristics."

It will thus be seen that when the present stat-
ute was enacted as an amendment to the 1929 Act, the term
"motor carrier" had a restricted meaning and applied only
to operations between two points, both of which were mu-
nicipal corporations.

This law apparently proved itself to be defective
in many ways (Section 22b, House Bill No. 335, Acts 1931),
and a comprehensive amendment was passed in 1931 making
many changes, one of which was the definition of a "motor
carrier". House Bill No. 335, Acts of 1931, Forty-second
Legislature.

As favorably reported with amendments by the
House Committee of Highways and Motor Traffic, March 17,
1931, House Bill No. 335 contained the following defini-
tion of a "motor carrier":

"Section 1. (f) The term 'motor carrier'
means any person, firm, corporation, company,
co-partnership, association or joint stock as-
sociation and their lessees, receivers or
trustees appointed by any court whatsoever,
owning, controlling, managing, operating or
causing to be operated any motor propelled ve-
hicle used in transporting property for com-
pensation or hire over any public highway in
this State; provided that the term 'motor car-
rier' as used in this Act shall not include
and this Act shall not apply to motor vehicles
operated exclusively within the incorporated
limits of cities or towns."

This definition was very comprehensive and rep-
resented a distinct departure from the former statute. It
included within the operation of the Act all transportation
of property for hire by motor vehicles over all public high-
ways in this State, outside the corporate limits of cities
or towns, without reference to distance or points of origin
and destination.

Various amendments were offered in the House and
Senate, the effect of which would have been to exempt cer-

Honorable James E. Kilday, Page 5

tain commodities and transactions for given maximum distances, but failed of adoption. The first reference to "traverse" is found in an amendment offered in the House and later in the Senate, but failed of adoption, which would have inserted in Section 1 (f) just before the proviso the following language:

"Where in the course of such transportation a highway is traversed between two or more incorporated towns or cities."

Amendments were made in the Senate to other sections of the Act, the House refused to concur, and a free conference committee was appointed. As reported from the free conference committee and as finally enacted the clause: "where in the course of such transportation a highway between two or more incorporated cities, towns, or villages is traversed," was included in Section 1 (g) defining a motor carrier.

We think it is reasonable to assume that the free conference committee thoroughly discussed the meaning and effect of changes made in the act during their deliberations and that the members of such committee were familiar with the purposes underlying the amendments made in committee. The bill was reported from the committee with the recommendation that it pass as written, but a minority statement was filed by members Beck and Pope, and printed. This statement read in part as follows:

"We, the undersigned members of House Free Conference Committee, appointed to consider House Bills No. 335 and No. 366, have failed to sign the majority report on House Bill No. 335 for the following reasons: . . .

"As reported and recommended by the majority of this conference committee, House Bill No. 335 provides (Section 5) that every common carrier shall obtain from the Railroad Commission a certificate of Public Convenience and Necessity and a permit (Section 6) if the applicant desires to operate as a contract carrier. Neither certificate or permit, however, is required of any operator who does not, in the course of his transportation, travel between or through two or more incorporated cities, towns and villages; likewise, permits are not required of those operating only with-

850

in the limits of incorporated cities and towns."
House Journal, Forty-second Legislature, p. 2055.

The general purpose of the change made in Section
1 (g) was clearly to restrict the definition in its scope.
The language in question might be construed as descriptive
of the highways where regulation would be effective, i.e.,
the jurisdiction of the Commission would extend to the reg-
ulation of hauling for hire only on or upon public highways,
situated or located between incorporated towns and to "tra-
verse" such a described highway, meaning to journey along
or upon it for any distance whatsoever. On the other hand,
the language may be construed as descriptive of the service,
i.e., the regulation of that service over any highway, which
service extends between or through two or more incorporated
towns without reference to the origin or ultimate destina-
tion of the transportation.

Evidently at least two members of the free confer-
ence committee thought the latter meaning was intended as
indicated by the minority statement quoted above.

We shall now examine the Act as a whole as an aid
in determining whether "traverse" was intended to mean trav-
eling for any distance on a public highway situated between
two or more incorporated towns, or traveling between, through
or beyond two or more incorporated towns on any public high-
way. It cannot mean traveling for any distance on any high-
way else the language becomes meaningless.

Section 1 (h) defines a "contract carrier" as "any
motor carrier as hereinabove defined transporting property
for compensation or hire over any highway in this State
other than as a common carrier".

Section 2 prohibits a "motor carrier" from trans-
porting property for hire "over any public highway in the
State except in accordance with the provisions of this Act",
intracity excepted. Section 4 gives authority to the Com-
mission to "supervise and regulate the transportation of
property for compensation or hire by motor vehicle on any
public highway in this State" in such matters as rates and
charges, safety regulations, schedules and services, month-
ly and annual reports, relationship with shipping public,
drivers license, and "all matters . . . to carefully pre-
serve, foster and regulate transportation and to relieve
the existing and all future undue burdens on the highways
arising by reason of the use of the highways by motor carriers",
and shall give "consideration to the recommendations of
the commissioners' courts of the several counties and to
the recommendations of the local government of any munici-
pality through or between which motor carriers operate".

Honorable James E. Kilday, Page 7

Section 5 requires common carrier "motor carriers" to secure certificates of public convenience and necessity to operate "over the public highways of this State." Numerous other rules and regulations are contained in the Act governing the operations of motor carriers which we do not consider necessary to enumerate here. Section 22b, in declaring the legislative policy, reads, in part, as follows:

> "The business of operating as a motor carrier of property for hire along the highways of this State is declared to be a business affected with the public interest. . ."

Upon a careful consideration of the Act as a whole we have concluded that the Legislature intended to regulate motor vehicles rendering a certain type service defined in the Act as "motor carriers", the service referred to being that in which the carrier in the course of his transportation travels from one incorporated town to another over any public highway in this State. The purpose was not to regulate all motor vehicles regardless of the nature of the service, operating on certain highways. Thus construed, the Act comes into harmony as a whole.

The construction we have given the Act is apparently in accord with the uniform departmental construction or practice in the enforcement of the Act from 1931 until recently, according to our information.

As pointed out above, prior to the 1931 amendment, the termini of the transportation was required to be municipal corporations. A significant change was made in the language in House Bill No. 335; however, it is only required that "in the course of such transportation" a highway be traversed between two or more incorporated towns, thus signifying that less than the whole route would be sufficient to bring the operator within the terms of the Act. It must be presumed that the Legislature had some purpose in mind in changing the wording of the definition. The fact that a highway between two incorporated cities is traversed in the course of a continuous transportation and included in the route is the factor which constitutes the operator for hire a "motor carrier".

Based upon the foregoing analysis, it is our opinion that:

1. The Railroad Commission of Texas has authority to issue a certificate of public convenience and neces-

Honorable James L. Kildey, Page 8

city covering routes from one incorporated city passing
through a second incorporated city to an unincorporated
town which is the terminus of operation since a portion
of the route is between incorporated cities.

2. The Railroad Commission of Texas does not
have authority to issue a certificate of public convenience
and necessity from an incorporated town to an unincorporat-
ed town where there are no towns between the two since no
portion of the transportation or route is between or through
two or more incorporated cities.

3. There is a distinction between the two oper-
ations described in your letter of request.

Yours very truly

ATTORNEY GENERAL OF TEXAS

By       *Cecil C. Cammack*
Cecil C. Cammack
Assistant

CCO:FG

APPROVED DEC 16, 1939

*Gerald C. Mann*
ATTORNEY GENERAL OF TEXAS

APPROVED
OPINION
COMMITTEE
BY _____
CHAIRMAN